**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-CV-61838-STRAUSS**

**SEBASTIAN GUENTHER,**

Petitioner,

v.

**ELIZABETH VICTORIA MCPHERSON,**

Respondent.
______________________________/

## ORDER ON PETITION[1]

THIS MATTER came before the Court for a two-day evidentiary hearing on July 27 and 29, 2026, on the Verified Complaint and Petition Under Hague Convention for Return of the Child to Plaintiff/Petitioner in Germany ("Petition") [DE 1]. The Court has considered the testimony and credibility of the witnesses, the exhibits admitted into evidence, the arguments of counsel, the parties' post-hearing submissions [DE 121, 123], and all other pertinent portions of the record. Having done so, the Court will grant the Petition for the reasons discussed herein.

## FINDINGS OF FACT

Petitioner and Respondent met in early 2018 on a bus going from Macedonia to Kosovo. Thereafter, they started a romantic relationship, Respondent moved to Germany (where Petitioner is from), and Petitioner and Respondent moved into an apartment together in Hannover, Germany (sometime in 2018). They lived there together until around late 2020, when Respondent moved back to the United States. Respondent moved into her mother's house in Broward County, Florida.

[1] Upon the consent of the parties, this case was referred to me to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. [DE 109]; *see also* [DE 81] at 2 (¶ 10), 4.

On February 16, 2021, Respondent gave birth to the parties' child, ZGM. Petitioner was in Germany at the time. He was initially unable to obtain a visa to come to the United States because of the pandemic. However, Petitioner was ultimately able to travel to the United States from May 2021 until August 2021. During that time, Petitioner stayed with Respondent and ZGM. After Petitioner returned to Germany in August 2021, he reenlisted in the German army.

Petitioner's and Respondent's romantic relationship had ended sometime in early or mid-2021. In June 2022, Respondent and ZGM went to Germany to visit Petitioner. Respondent stayed with a friend while in Germany. During the 2022 visit to Germany, Petitioner and Respondent went to a notary to execute a joint custody document [DE 120-4]. The document states, *inter alia*, that Petitioner and Respondent: (1) "declare that we wish to jointly assume parental care of [ZGM]"; and (2) "have been informed by the notary that, as a result of making joint declarations of custody, we have the duty and the right to jointly care for the minor child and that we can only jointly represent the child in the future." [DE 120-4]. Respondent knew that the purpose of the visit to the notary was to sign a document related to custody of ZGM.

The parties' notary appointment was not the smoothest or most optimal. Respondent's German is limited, and the notary did not speak English. Thus, the notary did not orally inform Respondent of anything in English. And Respondent did not understand much of what the notary said in German. Nonetheless, the custody document that the parties signed was translated into English using Google translate, and Respondent read each part of the document (except for potentially the last paragraph) in English before signing. *See* [DE 117] at 110-17. The English translation was on the same paper as the German version (as reflected in DE 120-4), and the parties signed a copy of that document [DE 120-4]. Respondent acknowledged that she does not dispute that she and Petitioner have had joint custody of ZGM "since that date." [DE 116] at 215. And

whatever shortcomings with the notary process may have existed, Respondent knew why the parties were going to the notary, and Respondent knew what she was agreeing to before she signed the joint custody document.

At the end of their 2022 visit to Germany, Respondent and ZGM returned to Respondent's mother's home in Florida. Following their return, Petitioner frequently spoke with ZGM on the phone and through Facetime. Around June 2023, Respondent and ZGM moved out of Respondent's mother's house, and in November 2023, Respondent and ZGM moved to Germany. They lived in Germany until Respondent left Germany with ZGM on June 25, 2025.

Respondent and ZGM lived with Petitioner from the time they arrived in Germany in November 2023 until July 2024. In July 2024, Respondent moved to her own apartment, which was nearby. She leased the apartment for a term that would run through June 2025.

Petitioner estimated that ZGM spent about 60% of her time with Respondent and about 40% of her time with Petitioner. Respondent, on the other hand, estimated that ZGM was with her about 85% of the time and with Petitioner only about 15% of the time. In all likelihood, the time spent with each party was probably somewhere in between the parties' estimates.[2] But two things are clear: (1) ZGM spent more time with Respondent, who was ZGM's primary caretaker; and (2) ZGM spent significant time with Petitioner, albeit less time than she spent with Respondent. Petitioner had continued to serve in the German army while ZGM was living in Germany. He generally stayed at his German army base a few nights each week, but he spent time with ZGM most weekends and tried to otherwise spend time with her when he could.

[2] Neither party seemed to overtly lack credibility in providing their somewhat diverging estimates. As discussed below, however, I found Respondent to lack credibility in several respects. On the other hand, I found Petitioner to be generally credible.

While in Germany (between November 2023 and June 2025), ZGM initially attended kindergarten at the Kammer International Bilingual School in Hannover, where Respondent worked. They subsequently switched to a different school, the International School Hannover Region. Respondent wanted to switch schools because the second school was closer to her apartment. While in Germany, ZGM made several friends and spoke in both German and English.

Around April or May 2025, Respondent told Petitioner that she wanted to return to the United States with ZGM. She had not previously told Petitioner that she wanted or intended to go back to the United States with ZGM. Petitioner wanted ZGM to stay in Germany and did not agree to ZGM returning to the United States. Respondent subsequently initiated court proceedings in Germany regarding ZGM's residence.

On June 22, 2025, the Hannover Local Court entered an Order [DE 120-1] transferring the right to determine ZGM's place of residence to Petitioner. The portion of the Order setting forth the Court's reasons for its decision "clarified that joint custody remains in place in all other areas." [DE 120-1] at 6. Respondent recognized the implications of the Order and seemed to acknowledge that Petitioner had custody rights even before the entry of the Order:

> Q. That order awards primary residential custody of your child to Mr. Guenther, correct.
> A. Correct.
> Q. Okay. And there was no question that Mr. Guenther had custody of the kid for years jointly with you. Not that he had greater custody before that order. Before that order you both had equal rights to custody, correct?
> A. Sure, yeah.
> Q. And this order was significant because it made him the primary residential parent when it came to custody, right?
> A. Yes.

[DE 116] at 228; *see also id.* at 203. The June 22, 2025 Order of the Hannover Local Court was affirmed on appeal. *See* [DE 120-2].

Respondent testified that she learned about the June 22, 2025 Order on the morning of June 24, 2025. Nevertheless, despite her knowledge of the Order and the fact that the court awarded Petitioner the right to determine ZGM's place of residence, Respondent left Germany with ZGM on June 25, 2025. She did so without Petitioner's consent. And Respondent did so knowing that Petitioner had custody rights. *See* [DE 117] at 128 ("Q. You knew he had custody rights on the day you left? A. That is correct."). Respondent testified that she initially went to New York for her aunt's funeral and that she then went down to Florida (to her mother's house in Broward County) around July 17, 2025.

Around August 2025, Petitioner applied to the State Department for a voluntary return letter. The letter was sent to Respondent at her mother's house, and Respondent sent a response stating she was not willing to agree to a voluntary return. Thereafter, on September 12, 2025, Petitioner commenced this action.

On September 17, 2025, five days after Petitioner filed his Petition in this action, Respondent went to Grenada with ZGM. Respondent denied knowing that this action had been filed at the time. Even if true, Respondent knew an action like this was likely imminent given that she had just received the voluntary return letter.

Respondent claimed to have gone to Grenada because she was afraid for her life. She has asserted in this action that Petitioner was abusive and violent (though as discussed below, Respondent's claims of abuse lacked credibility). Respondent further claimed to have disconnected from everyone and everything, including her mother, and that nobody, including her mother, could contact her in Grenada (where Respondent and ZGM stayed with family).

My findings of fact are based, in part, on my assessments of Petitioner's and Respondent's credibility. While I found Petitioner to be generally credible, I found that Respondent's testimony

lacked credibility overall and in several particular respects. This finding is based on particular testimony that either lacked corroboration[3] or did not add up, as well as my observations during the hearing, including my observations of Respondent's demeanor. As to her demeanor, for one example, I found Respondent to be evasive in answering numerous questions, including questions about the joint custody document she signed in 2022.

As to particular portions of her testimony, I found, for instance, Respondent's testimony of abuse by Petitioner was not credible. There was no corroboration for any of her abuse allegations, which appear to be allegations that she has only begun making in recent months. One of Respondent's abuse allegations was that Petitioner threw a remote at ZGM's head in December 2023. Yet, to substantiate this allegation (which was apparently based on hearsay and not Respondent's personal knowledge), Respondent provided a photograph from January 2024 relating to an incident that occurred when Petitioner was not even with ZGM. Additionally, Respondent, who stressed how great her memory is, particularly when it comes to dates, seemed to misstate or not accurately remember dates related to the alleged remote incident. Moreover, contrary to Respondent's testimony, Petitioner credibly testified that he has never thrown a remote at ZGM or done anything else to intentionally hurt her.

Respondent's allegations of timing and abuse also did not make sense in the context of her behavior and actions. She testified that Petitioner's abusive behavior started when she was initially living with him in Germany, including that he threw dishes and shoes at her in August 2020 when she was pregnant and that he raped her in September 2020. But Respondent then invited Petitioner into her mother's house in the United States for three months (beginning in May 2021). While

[3] To be clear, I did not find to Respondent to lack credibility merely because of the lack of corroboration.

there, Respondent testified that Petitioner forcibly grabbed her arm on July 15, 2021, while she was holding ZGM. Yet, the following year, Respondent decided to go to Germany with ZGM for a visit and sign a joint custody document. And the year after (2023), Respondent decided to move to Germany and live with Petitioner, at least until she found her own place. By June 2024, she claims to have suffered abuse to the point of seeking aid from the police (which was allegedly rebuffed), yet nevertheless remained in Germany for an entire year thereafter. As discussed below (in analyzing Respondent's grave-risk arguments), Respondent's testimony regarding her alleged attempt to make a police report regarding abuse by Petitioner lacked credibility and further called into question the credibility of Respondent's already non-credible allegations of abuse.

Respondent also testified that she disclosed allegations of abuse to Bastian Wrede, the guardian ad litem in the proceedings in Germany. However, Mr. Wrede testified that Respondent never said anything about abuse by Petitioner and never raised any issue of abuse in those proceedings. On the contrary, Mr. Wrede testified that Respondent told him ZGM had a good relationship with Petitioner. Unlike Respondent's testimony, I found Mr. Wrede's testimony to be credible.

Another aspect of Respondent's testimony that lacked credibility pertained to her decision to move to Germany with ZGM. Her explanation for deciding to move to Germany in 2023 was essentially that Petitioner and his mother guilted Respondent into doing so. She claims that she agreed to move with ZGM but that she would only do so for eighteen months. I found Respondent's explanations on this topic weak, and I found her testimony that she told Petitioner

she would only move to Germany for eighteen months to lack credibility. Nor was her testimony that she subjectively intended to move to Germany for only eighteen months credible.[4]

## ANALYSIS

The Hague Convention on the Civil Aspects of International Child Abduction ("Convention") "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Cuenca v. Rojas*, 99 F.4th 1344, 1347 (11th Cir. 2024) (quoting *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)). "The Convention's core premise is that children's interests in custody matters are best served when custody decisions are made in the child's country of habitual residence." *Id.* (citing and quoting *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020)) (internal quotation marks omitted). The Convention aims "to return children to the country 'of their habitual residence' and to 'ensure that rights of custody and of access under the law of one . . . state are effectively respected in the other . . . states.'" *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1358 (11th Cir. 2020) (quoting *Chafin v. Chafin*, 742 F.3d 934, 936 (11th Cir. 2013)) (alterations adopted); *see also Gomez v. Fuenmayor*, 812 F.3d 1005, 1011 (11th Cir. 2016) ("When a child has been wrongfully removed from his country of habitual residence, the Convention provides the non-abducting parent with a remedy of return, intended to restore the parties to the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic forum for child custody proceedings." (cleaned up)).

"The United States ratified the Convention, and Congress implemented it through the International Child Abduction Remedies Act (ICARA)." *Cuenca*, 99 F.4th at 1347. The Convention and ICARA "empower courts in the United States to determine only rights under the

[4] Respondent testified that she took an eighteen-month leave of absence from her job with Broward County Public Schools. However, she provided very little detail or explanation, and absolutely no corroboration, regarding this alleged leave of absence.

Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4); *see also Calixto v. Lesmes*, 909 F.3d 1079, 1083 (11th Cir. 2018) ("[A] court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle." (citation omitted)). "ICARA allows the parent of an abducted child to file a petition for the child's return in a state or federal court in the jurisdiction where the child is located, and directs courts to 'decide the case in accordance with the Convention.'" *Cuenca*, 99 F.4th at 1347 (quoting 22 U.S.C. § 9003 (a)-(b), (d)). "Consistent with the objects of the Convention, ICARA provides that 'children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.'" *Id.* (quoting 22 U.S.C. § 9001(a)(4)) (alteration adopted).

"A petitioning parent must prove 'by a preponderance of the evidence, that her child was wrongfully removed or retained within the meaning of the Convention.'" *Berenguela-Alvarado*, 950 F.3d at 1358 (quoting *Chafin*, 742 F.3d at 938). Here, for Petitioner to establish a prima facie case of wrongful removal, he must prove the following three elements: (1) ZGM was a "habitual resident" of Germany immediately before her removal from Germany; (2) Respondent's removal of ZGM from Germany breached Petitioner's custody rights under German law; and (3) Petitioner "had been exercising [his] custody rights at the time of" removal. *Id.* As discussed herein, I find that Petitioner has established the foregoing elements by a preponderance of the evidence. Consequently, Petitioner is entitled to have ZGM returned unless Respondent is able to establish the existence of an enumerated affirmative defense. *Id.*; *see also Golan v. Saada*, 596 U.S. 666, 672 (2022) ("If the court finds the child was wrongfully removed or retained, the respondent opposing return of the child has the burden of establishing that an exception to the return requirement applies. . . . Absent a finding that an exception applies, a child determined to be

wrongfully removed or retained must be 'promptly returned' to the child's country of habitual residence." (internal citations omitted)). "[T]hese affirmative defenses should be 'construed narrowly' so as 'to prevent them from swallowing the rule and rendering the Convention a dead letter.'" *Berenguela-Alvarado*, 950 F.3d at 1358-59 (citation omitted).

Here, Respondent raised three affirmative defenses. First, she alleged that "Petitioner was not exercising custody rights at the time of the alleged removal or retention, and Petitioner's failure to exercise such rights was unrelated to the alleged removal or retention." [DE 63] at 3. Second, Respondent alleged that "[t]he child objects to being returned and has attained an age and degree of maturity at which it is appropriate for the Court to take account of the child's views under Article 13 of the Hague Convention." *Id.* Third, Respondent alleged that "[t]here is a grave risk that returning the child would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation within the meaning of Article 13(b) of the Hague Convention." *Id.* at 4. Respondent has the burden of establishing her first two defenses (lack of exercise of custody rights and objection by a mature child) by a preponderance of the evidence, and she has the burden of establishing her third defense (grave risk of harm) by clear and convincing evidence. 22 U.S.C. § 9003(e)(2).

Respondent appears to have abandoned her first two defenses, as she does not address them in her Proposed Findings of Fact and Conclusions of Law [DE 123]. Instead, she asserts that the following "[t]hree issues principally govern the Court's determination": (1) habitual residence; (2) what custody rights Petitioner had under German law; and (3) Respondent's grave risk defense.

As discussed in Section A below, ZGM was a habitual resident of Germany immediately before her removal from Germany. As discussed in Section B, Respondent's removal of ZGM from Germany breached Petitioner's custody rights under German law. As discussed in Section

C below, Petitioner had been exercising his custody rights at the time of removal (though Respondent no longer appears to contend otherwise). Thus, Petitioner has established a prima facie case of wrongful removal, and had Respondent not abandoned her first affirmative defense, it would nevertheless fail. Nor has Respondent established any other affirmative defense. As discussed in Section D, Respondent has not established her grave risk defense, and as discussed in Section E, the mature-child exception (which Respondent has abandoned) does not apply either.

**A. HABITUAL RESIDENCE**

Based on the totality of the circumstances, the Court finds that Petitioner has shown, by a preponderance of the evidence, that ZGM was a habitual resident of Germany immediately before her removal from Germany. "[A] child's habitual residence depends on the totality of the circumstances specific to the case. An actual agreement between the parents is not necessary to establish an infant's habitual residence." *Monasky*, 589 U.S. at 71. In other words, "the determination of habitual residence does not turn on the existence of an actual agreement." *Id.* at 76. "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Id.* at 77. "Because locating a child's home is a fact-driven inquiry, courts must be 'sensitive to the unique circumstances of the case and informed by common sense.'" *Id.* at 78 (citation omitted). "No single fact . . . is dispositive across all cases." *Id.*

Here, the totality of the circumstances show that ZGM was at home in Germany at the time of removal. At the time of removal, ZGM had lived in two different countries. She lived in the United States for the first 2 years and 9 months of her life, and she lived in Germany for the next 1 year and 7 months of her life (i.e., until she was 4 years and 4 months old). The parties dispute whether they intended for ZGM's move to Germany to be permanent or temporary. The credible evidence as a whole, however, seems to suggest that the parties intended for ZGM's move to

Germany to be indefinite. They did not necessarily intend for ZGM to move to Germany permanently, but they also did not rule it out or intend for ZGM to only move there for some temporary, finite period. As noted in the Findings of Fact above, Respondent's testimony that she only intended to move to Germany with ZGM for 18 months was simply not credible.

But the parties' intentions are only one relevant consideration. Again, what ultimately matters the most is where ZGM was at home as of June 25, 2025. And that was Germany. The credible evidence showed that ZGM lived in Germany continuously from the age of 2 years and 9 months until 4 years and 4 months. During those formative years of her life, she attended school in Germany, she made friends in Germany, she spoke German (in addition to English), and both of her parents lived in Germany with her. As of the time Respondent left Germany with ZGM, Germany appears to have been where ZGM was most comfortable, and ultimately, where she was at home. The fact that ZGM attended two schools and lived in two separate places during her time in Germany does not change the fact that ZGM was at home in Germany at the time of removal. Nor does the fact that Respondent had family and friends in the United States. After all, inversely, Petitioner had family and friends in Germany. But what matters most is that ZGM was at home in Germany at the time of removal.

At bottom, the Court finds, based on the totality of the circumstances, that ZGM was "at home" in Germany before Respondent removed ZGM from Germany on June 25, 2025. Therefore, the Court finds that ZGM was a habitual resident of Germany immediately before her removal from Germany.

### B. BREACH OF CUSTODY RIGHTS

The Court finds that Respondent's removal of ZGM from Germany breached Petitioner's custody rights under German law. "The term 'rights of custody' does not have a fixed definition, but it is not limited to physical custody." *Palencia v. Perez*, 921 F.3d 1333, 1338 (11th Cir. 2019). "The Hague Convention takes an expansive view of the concept, explaining that rights of custody shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.* at 1338-39 (cleaned up) (quoting Convention, Art. 5(a)). "The Convention's intent is for courts to invoke in the widest possible sense the law of the child's habitual residence." *Id.* at 1339 (cleaned up) (citation omitted). It aims to "protect *all* the ways in which custody of children can be exercised" and "favors a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration." *Id.* (quoting *Hanley v. Roy*, 485 F.3d 641, 645 (11th Cir. 2007)). Rights of custody "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the State." *Hanley*, 485 F.3d at 645 (quoting Convention, art. 3). "The violation of a *single* custody right suffices to make removal wrongful. A parent need not have custody to be entitled to return of the child; rather, he need only have one right of custody." *Palencia*, 921 F.3d at 1339 (cleaned up) (quoting *Hanley*, 485 F.3d at 647). And the parent "need not have a *sole* or even *primary* right of custody." *Hanley*, 485 F.3d at 647 (quoting *Furnes v. Reeves*, 362 F.3d 702, 714-15 (11th Cir. 2004)).

The parties' dispute regarding whether Respondent's removal of ZGM from Germany breached Petitioner's custody rights turns on whether Petitioner had custody rights to begin with. He clearly did. Three days before ZGM's removal, the Hannover Local Court issued an order (i.e., a judicial decision) awarding Petitioner the right to determine ZGM's place of residence. [DE

120-1]. Significantly, Article 3 of the Convention expressly provides that rights of custody may arise by reason of a judicial decision. Convention, art. 3; *see also Hanley*, 485 F.3d at 645. And Article 5 of the Convention expressly provides that the right to determine the child's place of residence is a right of custody. Convention, Art. 5(a); *see also Palencia*, 921 F.3d at 1338-39. Notably, both parties' experts in family law agreed that the right to determine residence is a custodial right under German law, albeit not the entirety of custody. *See* [DE 117] at 192-93, 196.

Respondent's argument that Petitioner did not have custody rights hinges on her contention that the parties' joint custody document [DE 120-4] is invalid. The significance of the joint custody document is that – consistent with the testimony of Dr. Hanke (Respondent's expert in German notarial and family law) – German law provides the following regarding the children of parents who are not married at the time of their child's birth:

> (1) Where the parents, at the date of the birth of the child, are not married to one another, they have joint parental custody (1) if they declare that they wish to take parental custody jointly, (2) if they marry one another, (3) if the family [court] transfers joint parental custody to them.
>
> (2) On application by a parent, the family court is to transfer parental custody or a part of parental custody to both parents jointly in accordance with subsection (1) no. 3 if the transfer is not inconsistent with the best interests of the child. If the other parent fails to submit reasons which might be inconsistent with the transfer of joint parental custody, and if not such reasons are manifest, it is to be presumed that joint parental custody is not inconsistent with the best interests of the child.
>
> (3) Apart from this the mother has parental custody.

*Rehder v. Rehder*, No. C14-1242RAJ, 2014 WL 6982530, at *6 (W.D. Wash. Dec. 9, 2014) (quoting German Civil Code § 1626a). Therefore, Respondent's argument goes, absent a valid joint custody declaration, only Respondent would have custody of ZGM under German law.

Regarding the potential invalidity of the joint custody document, Dr. Hanke testified that the document is deficient because the notarization process failed to comply with German law. For instance, the document failed to reflect that Respondent is limited in speaking and understanding

German, and neither the notary nor an interpreter translated the document for Respondent (the document was only translated into English via Google).

But even assuming that the joint custody document is deficient under German law (i.e., that it failed to strictly comply with notarial requirements under German law), the fact remains that Petitioner had at least one custody right under German law at the time of removal, the right to determine residence. And he had that right by reason of a judicial decision (the Hannover Local Court's June 22, 2025 Order). Under binding Eleventh Circuit case law, that one right of custody (to determine residence) is all that is needed (even if Petitioner had no other rights of custody) to have a right of custody under the Convention. *See Palencia*, 921 F.3d at 1338-39; *Hanley*, 485 F.3d at 645-47. And Respondent's removal of ZGM from Germany plainly breached that right, making her removal of ZGM wrongful. Respondent nevertheless contends, again relying on the issues with the notarization process, that the German court wrongly assumed the joint custody declaration was valid in awarding Petitioner the right to determine residency. That is certainly possible. But this Court cannot conclude on the record before it that the German court would not have awarded Petitioner the right to determine ZGM's residence without the existence of the joint custody declaration.[5] At any rate, the fact remains that the German court did award the right to determine residence (a custodial right) to Petitioner, and the court's order remains in effect. In fact, as noted above, the order was affirmed on appeal. If Respondent believes the German trial court (and appellate court) incorrectly applied German law and incorrectly relied on the joint custody declaration, that is an issue Respondent must take up with the courts in Germany.

---

[5] The German court's order does not mention the joint custody declaration. According to Petitioner's attorney in the German proceedings, no one raised the question of whether the declaration was valid or invalid. So it is unclear what consideration the German court gave to the joint custody declaration or what, if any, significance that court placed on it.

Ultimately, the record before this Court establishes (by far more than a preponderance of the evidence) that: (1) a judicial decision of a German court has awarded the right to determine ZGM's place of residence to Petitioner; (2) the German court's decision remains in effect; (3) the right to determine ZGM's place of residence is a right of custody under German law (and under the Convention); and (4) Respondent violated Petitioner's right to determine ZGM's place of residence when Respondent removed ZGM from Germany without Petitioner's consent (the day after Respondent received notice of the German court's order). Thus, Respondent's removal of ZGM from Germany evidently breached Petitioner's custody rights under German law.

**C. EXERCISING CUSTODY RIGHTS**

At the time of removal, Petitioner had been exercising his custody rights. Petitioner's burden of showing that he was exercising his custody rights is minimal. *Asvesta v. Petroutsas*, 580 F.3d 1000, 1018 (9th Cir. 2009). "The standard for finding that a parent was exercising his custody rights is a liberal one." *Baz v. Patterson*, 100 F.4th 854, 871 (7th Cir. 2024) (quoting *Walker v. Walker*, 701 F.3d 1110, 1121 (7th Cir. 2012)). "A person who has valid custody rights to a child under the law of the country of the child's habitual residence cannot fail to exercise those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Id.* (internal quotation marks and citation omitted). Courts should find that a parent was exercising his custody rights if he kept or sought to keep "any sort of regular contact with" his child. *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344-45 (5th Cir. 2004); *Jaimes v. Tavera*, No. 1:25-cv-22551-Gayles, 2025 WL 3534097, at *6 (S.D. Fla. Dec. 10, 2025). "[I]n the absence of a ruling from a court in the child's country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes 'exercise' of those rights." *Sealed Appellant*, 394 F.3d at 345. Once a court "determines that the

parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly." *Sealed Appellant*, 394 F.3d at 345 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)).

Here, as is evident from the Court's findings of fact above, Petitioner sought to maintain regular contact with ZGM and was able to do so prior to ZGM's removal from Germany. "That is enough to establish that [Petitioner] was exercising [his] rights of custody at the time of" removal. *Baz*, 100 F.4th at 871.

**D. GRAVE RISK**

Respondent has not shown that the grave-risk exception applies here. The grave-risk exception applies when "there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Silva v. Dos Santos*, 68 F.4th 1247, 1254 (11th Cir. 2023) (quoting Convention, Art. 13(b)) (cleaned up); *see also Golan*, 596 U.S. at 676 ("[A] court 'is not bound to order the return of the child' if the court finds that the party opposing return has established that return would expose the child to a 'grave risk' of physical or psychological harm." (citation omitted)). "A respondent arguing that return would expose the child to a grave risk of harm must establish that this exception applies by 'clear and convincing evidence.'" *Golan*, 596 U.S. at 672 (quoting 22 U.S.C. § 9003(e)(2)(A)).

The grave-risk exception "was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests." *Galaviz v. Reyes*, 95 F.4th 246, 257 (5th Cir. 2024). A "party seeking to establish the exception must 'show that the risk to the child is grave, not merely serious.'" *Gomez*, 812 F.3d at 1012 (citations omitted); *see also Silva*, 68 F.4th at 1254. "The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize." *Galaviz*, 95 F.4th at 256 (citation omitted). "The alleged harm must be a

great deal more than minimal and greater than would normally be expected on taking a child away from one parent and passing him to another." *Id.* at 256-57 (internal quotation marks and citation omitted). Additionally, the relevant inquiry is whether returning the child to the child's country of habitual residence "would expose [the child] to a grave risk of harm going forward." *Gomez*, 812 F.3d at 1015. "[T]he proper inquiry focuses on the risk faced by the child, not the parent." *Id.* at 1010. However, "sufficiently serious threats and violence directed against a parent can nonetheless pose a grave risk of harm to a child as well." *Id.*

Respondent argues that the grave-risk exception applies

> based upon the cumulative post-return circumstances established at trial, including the evidence of Petitioner's prior aggression and threats, Respondent's difficulties obtaining assistance in Germany, the outstanding arrest warrant and resulting uncertainty regarding Respondent's ability to maintain continuous access to [ZGM], the completed German residence proceeding, [ZGM]'s young age and existing psychological symptoms, and Dr. Young's testimony concerning the potential longer-term consequences associated with disruption of an established caregiving relationship.

[DE 123] at 21.

First, as discussed in the Findings of Fact above, no credible evidence established that Petitioner has ever physically abused Respondent or ZGM. Second, no credible evidence indicated that Petitioner ever threatened violence. Respondent did testify a few times that Petitioner threatened her, but she seemed to be asserting that Petitioner's alleged threats were to seek custody of ZGM. *See, e.g.*, [DE 117] at 80. While Respondent implied that Petitioner's threats were to use (or, rather, *mis*use) the German legal system against her, Respondent's suggestion that Petitioner threatened any sort of wrongful conduct – or said anything beyond what many parents involved in custody disputes say to one another – was not credible.

Third, Respondent's contentions regarding an inability to seek assistance in Germany were not credible. Respondent testified that she attempted to report Petitioner's alleged abuse to the

police in June of 2024. She said that she told the police she "would like to make a police report regarding [her] child's father, and that was as far as [she] got." [DE 117] at 75. According to Respondent, the police informed her "that they do not speak English and that they cannot help" her. *Id.* Respondent believes the police dismissed her because of "cultural and language barriers" – because she is black and because she needed to communicate in English (and could only speak some broken German). [DE 116] at 255-56; [DE 117] at 75. She testified that she asked if anyone there spoke English, "and they said no." [DE 116] at 256.

Overall, Respondent's testimony regarding her alleged visit to the police station was not credible. She was very nondescriptive about what she attempted to communicate to the police, and she seemed to abandon making a police report very quickly and easily. One would expect to see some greater persistence from an individual facing the type of abuse that Respondent alleged. In observing the foregoing, I recognize the difficulties that many victims of domestic violence face in reporting abuse. Many have such difficulty in even making any initial report. But here, Respondent allegedly went to the police station to make a report but gave up immediately solely because the police allegedly told her that nobody at the station spoke English. Moreover, per Respondent's testimony, after allegedly experiencing all of the abuse that prompted her to go to the police, and allegedly being callously rebuffed by the police, and despite allegedly having no intention of remaining in Germany long-term, Respondent nevertheless started a new lease on an apartment and remained in Germany for an entire year without seemingly any obligation (in her mind) to do so. Once again, Respondent's testimony did not fully add up, and that, combined with her overall demeanor and lack of credibility, made her allegations regarding the police station and abuse by Petitioner not credible.

The primary remaining component – and one of the largest components – of Respondent's grave-risk argument centers around Respondent's belief that a grave risk of harm exists if ZGM returns to Germany because return may cause Respondent to be separated from ZGM, and a disruption in ZGM's relationship with Respondent poses a grave risk of psychological harm. There are essentially two parts two this argument: (1) if ZGM returns to Germany, there is, as Respondent puts it, "uncertainty" regarding her ability to maintain access to ZGM, [DE 123] at 21; and (2) a disruption in ZGM's relationship with Respondent poses a grave risk of psychological harm. As to the first part of the argument, the Court agrees that there may be such "uncertainty." But whether and to what extent each parent should have custody is a matter that can (and must) be addressed with the court in Germany (which has only adjudicated the parties' dispute over the right to determine ZGM's residence). After all, "[t]he Convention's return requirement is a 'provisional' remedy that fixes the forum for custody proceedings." *Monasky*, 589 U.S. at 72. Moreover, even assuming return would result in a brief disruption of ZGM's ability to spend time with Respondent, anything more than a brief disruption is speculative (or, as Respondent puts it, uncertain). And "[m]ere speculation does not meet the clear and convincing burden." *Galaviz*, 95 F.4th at 256.

At any rate, even if Respondent had shown by clear and convincing evidence that return would likely result in a long-term disruption of the relationship between Respondent and ZGM, "the possible separation of a child from a parent is not sufficient to trigger the grave risk of harm

exception."[6] *Madrigal v. Tellez*, 848 F.3d 669, 677 (5th Cir. 2017).[7] To be clear, the Court is mindful of the difficulty and pain that separation of parent and child can cause. The tragedy of this case – and many cases like it – is that such pain is inherent when parents cannot agree on the country in which their children should reside, thus requiring courts to order the child to one country or another. But, again, for the grave risk exception to apply, "[t]he alleged harm must be . . . greater than would normally be expected on taking a child away from one parent and passing him to another." *Galaviz*, 95 F.4th at 256-57 (internal quotation marks and citation omitted). If the type of harm described by Respondent were enough to satisfy the grave risk exception, that exception would truly "swallow[] the rule and render[] the Convention a dead letter.'" *Berenguela-Alvarado*, 950 F.3d at 1358-59 (citation omitted). Rather, "the impact of any loss of contact with [Respondent] is something that must be resolved by the courts of [ZGM's] habitual residence." *Charalambous v. Charalambous*, 627 F.3d 462, 469 (1st Cir. 2010).

For the foregoing reasons, Respondent has failed to establish the applicability of the grave-risk exception.

---

[6] Dr. Young testified that abrupt severance of the relationship between a child and a parent to whom the child is strongly attached can lead to negative long-term consequences. While Dr. Young testified eloquently and credibly, her testimony, combined with the totality of the other evidence, is insufficient to satisfy the grave-risk exception.

[7] *See also Cuellar v. Joyce*, 596 F.3d 505, 511 (9th Cir. 2010) ("The district court also denied relief based on K.C.'s attachment to the United States and her father, and the psychological harm that would result if she were to return to Panama. This was a very serious error. The fact that a child has grown accustomed to her new home is never a valid concern under the grave risk exception, as it is the *abduction* that causes the pangs of subsequent return. Rather than allowing an abducting parent to profit from the psychological dislocation that he has caused, the Convention attempts to avoid the harm by deterring parents from abducting their children in the first place." (internal citations and quotation marks omitted)).

**E. MATURE CHILD**

No credible evidence was presented to show that the mature-child exception may apply here, and again, Respondent appears to have abandoned her argument that the exception applies. Under this exception, "a court may 'refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.'" *Boa-Bonsu v. Owusu*, 178 F.4th 1027, 1029 (6th Cir. 2026) (quoting Convention, Art. 13). "The burden is on [Respondent] to establish by a preponderance of the evidence that this exception applies." *Romero v. Bahamonde*, 857 F. App'x 576, 583 (11th Cir. 2021) (citing 22 U.S.C. § 9003(e)(2)(B)). "Courts have relied primarily on three considerations in determining when this exception applies: (1) whether the child is sufficiently mature; (2) whether the child has a particularized objection to being repatriated; and (3) whether the objection is the product of undue influence." *Id.* (citation omitted).

The mature-child exception is not met here. First, no credible evidence suggested that ZGM, who is currently five years-old, is sufficiently mature. On the contrary, the testimony of Petitioner, Dr. Kelly Santandrea,[8] and Mr. Wrede (the German guardian ad litem) all credibly indicated that ZGM does not possess sufficient maturity. Additionally, no credible evidence demonstrated that ZGM has a particularized objection to being repatriated. "In determining whether a child has particular objections to repatriation, courts consider whether the child is expressing merely a preference against return or is 'affirmatively objecting to returning to one country—when living in that country would be unacceptable.'" *Id.* (quoting *Rodriguez v. Yanez*,

[8] Dr. Santandrea is a board certified licensed clinical and forensic psychologist who testified as an expert in child and adult psychology. She met with and evaluated Petitioner and ZGM for a total of roughly 6 hours the Saturday before the evidentiary hearing.

817 F.3d 466, 477 (5th Cir. 2016)). Here, none of the evidence presented demonstrated that ZGM affirmatively objects to returning to Germany. Thus, the mature-child exception does not apply.

## CONCLUSION

For the reasons discussed above, it is **ORDERED** and **ADJUDGED** that the Petition [DE 1] is **GRANTED**. The minor child, ZGM, shall return to Germany with Petitioner. Petitioner shall retrieve his and ZGM's passport and travel documents from the Clerk of Court by **September 11, 2026**. Respondent may retrieve her passport from the Clerk of Court on or after **September 14, 2026**. The Clerk shall **CLOSE** this case, with any pending motions being **denied as moot**. The Court reserves jurisdiction to enforce this Order.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 4th day of September 2026.

Jared Strauss

**Jared M. Strauss**
**United States Magistrate Judge**